WHITE DIAMOND CO., LTD., a Corporation organized and existing under the laws of Thailand, Plaintiff,

v.

CASTCO, INC., Defendant.

No. 02 Civ. 9991(RWS).

United States District Court, S.D. New York.

June 21, 2006.

Steven A. Swidler, P.C., by Steven A. Swidler, Esq., Lisa Solomon, Esq., of counsel, New York, NY, for Plaintiff.

Israel Vider, Esq., Brooklyn, NY, for Defendant.

## OPINION

SWEET, District Judge.

Plaintiff White Diamond Co., Ltd. ("White Diamond") has moved for summary judgment pursuant to Rule 56, Fed. R.Civ.P., against defendant Castco, Inc. ("Castco"). Castco has cross-moved for summary judgment on its counterclaims and alternatively for leave to amend its counterclaims. For the reasons set forth below, the White Diamond motion for summary judgment is granted, Castco's cross-motion for summary judgment is denied, and leave is granted to Castco to amend its counterclaims.

### Prior Proceedings

White Diamond filed its complaint on December 18, 2002, seeking $418,687.57 for account stated and goods sold and delivered. Castco filed its answer on March 11, 2003, alleging a set-off and counterclaims for lost profit and damages.

Discovery proceeded.

The instant motions were marked fully submitted on December 21, 2005.

### The Facts

The facts are set forth in the Local Rule 56.1(b) Statement of White Diamond, the Response of Castco, and the Response of White Diamond to Defendant's Statement. The facts are not disputed except as noted.

White Diamond is and was at all times set forth in the complaint a corporation organized and existing under the laws of Thailand with a principal place of business at 221/42 Petchkasem Road, Bangkae, Bangkok 10160, Thailand.

Castco is a New York corporation, which during the time period complained of, maintained its offices at 236 West 30th Street, New York, New York.

Commencing in 1999, White Diamond manufactured for Castco diamond and precious color stone jewelry, and semi-precious jewelry including rings, pendants, earrings, and bracelets, continuing through the end of 2002. In this action White Diamond seeks to recover from Castco the contract price for jewelry that White Diamond alleges it manufactured, sold, and delivered to Castco throughout the course of their relationship. In response to White Diamond's claims for accounts stated and goods sold and delivered, Castco has raised three counterclaims—one for set-off and two for lost profits or destruction of business damages.

Throughout the course of their relationship, Castco received invoices from White Diamond which usually accompanied shipments, although on some occasions invoices were received without merchandise. Shipments were sent from White Diamond to Castco in New York. On occasion, shipments were made by Castco to White Diamond for the purpose of repairs. Castco would have someone physically count the items received. Castco has not identified shipments received from White Diamond that were "short," although Castco's president, Matthew Solow ("Solow"), has testified after this litigation was commenced that short shipments were received. Castco has produced no documents evidencing written notice to White Diamond of any requested credit for a short shipment, but Solow stated that White Diamond was advised of shortages by phone or e-mail. Prior to 2002, Castco did not identify any invoices that Castco did not receive merchandise for, and Solow was "not entirely sure" if he had e-mails that disputed a particular invoice.

Solow alone inputted and posted the invoices received from White Diamond as well as payments made to White Diamond on Castco's Peachtree accounting system. At any given time Solow could access his office computer and see how many invoices he received from White Diamond and how many payments he made. Castco has not produced copies of any of their vendor ledger statements subsequent to the statement dated February 10, 2004, despite a request therefor.

White Diamond admits to many orders and deliveries over a three-year period, but disagrees with Solow's contention that there were deliveries that were untimely, defective, and not in accordance with the agreement between the parties.

Castco admits that there are invoices due White Diamond. In this litigation Castco claims a set-off and credit to these unpaid invoices. Solow admits that except for the first few transactions, Castco would always have "an outstanding balance" due White Diamond. According to Solow, however, the balance due White Diamond does not exceed Castco credits or set-off. Castco admittedly received statements of account from White Diamond, but Solow

does not recall examining such statements for accuracy, testifying that: "I might give it a cursory glance or I might give it a very good look. I don't recall." (Solow Deposition at 222). It is possible that the statements of account were thrown out by Solow after he looked at them.

The statement annexed to the complaint as Exhibit "A" contains itemized charges and credits showing dates, invoice numbers and open balances from January 2000 to October 24, 2004. Castco has challenged the $318,066.15 balance of May 1, 2000 as unsupported by documentation, although Solow acknowledged the schedule annexed to the complaint as a statement of account prepared by White Diamond.

Solow did not check the statement annexed to the complaint for accuracy although Castco had the information available to check the accuracy of those transactions listed on the statement. He did not check the "arithmetic" or compare the invoices itemized on the statement with the invoices in Castco's files, even though he felt that there were numbers that were inaccurate. (Solow Deposition at 227).

Solow does not recall what particular goods were returned by Castco to White Diamond for repair. With respect to credit "for returned and/or rejected merchandise" other than repairs, Solow testified that Castco sent back or returned goods "very infrequently" and "it was, if at all, minimal, minuscule." (Solow Deposition at 90).

Under the terms of their relationship, Castco would not be charged for the cost of diamonds which it provided to White Diamond. The cost for stones would not be included in any invoice received by Castco where it provided the stones. Solow could not "recall" receiving an invoice from White Diamond that incorrectly included the cost of jewelry supplied by Castco. (Solow Deposition at 79).

There were instances where jewelry was returned by Castco to White Diamond for repair. Solow does not concede that the instances were occasional. According to White Diamond, White Diamond made repairs to the merchandise when requested and reshipped the goods back to Castco at no charge. The $418,687.57 balance due claimed by White Diamond does not include any of the invoices forwarded to Castco with repaired jewelry. The invoices accompanying the repaired jewelry contained a legend stating "no payment."

According to Solow, Castco is entitled to adjustments, credits, and charge-backs. Castco had an opportunity to advise White Diamond of any mistake in billing. If White Diamond mistakenly included a "repair invoice" in its statements of account in the course of their dealings, Solow has claimed that he advised White Diamond of mistakes by e-mail or phone. Castco has not notified or advised White Diamond that any "repair invoice" is part of any balance claimed as due. Castco also has not advised White Diamond of any specific billing mistake.

In the course of their dealing, Castco never sent a charge-back or credit memo to White Diamond indicating the cost of repairs to the merchandise White Diamond had manufactured. Despite acknowledging that White Diamond requested a calculation of repair costs incurred by Castco, "the exact number was never calculated" by Castco during the course of dealing between the parties. (Solow Deposition at 93).

Solow admitted to no specific knowledge of any White Diamond invoices adjusted based upon undelivered goods or goods delivered after the deadline by stating: "Do I know of them now? No. I would have to check." (Solow Deposition at 96).

At the time of his deposition, Solow was unaware if there was any document indicating how credits and adjustments, allegedly totaling $75,158.52, are due to Castco. Solow testified that he compiled the number $75,158.52 as the amount of credits due Castco "at some point with—in conjunction with my attorney and arising from meetings with my attorney." (Solow Deposition at 161–62). Solow was "not sure" if he had any canceled checks reflecting payments made by Castco for repairs and Solow did not "recall" if he referred to canceled checks in compiling the numbers. (Solow Deposition at 164–65).

In connection with its lost profits claim, Castco alleges that White Diamond failed to timely manufacture and deliver merchandise and that, as a result, Castco "was unable to deliver the merchandise it had committed to deliver to its vendees."

In an e-mail dated October 22, 2002, well after the last order had been produced by White Diamond, Solow informed White Diamond that M. Fabrikant & Sons, Inc. ("Fabrikant") placed an additional order with Castco and that "Fabrikant would not let this item go to other people. They insist I (Castco) do it." (E-mail October 28, 2002).

Solow was not sure whether he had retained any purchase orders from Fabrikant during the period of time Castco did business with White Diamond. At the time of his deposition, Solow did not know if Castco had any canceled orders in its files reflecting orders which were lost, and Solow could not state, affirmatively or negatively, whether Castco actually has any canceled orders.

Solow did not recall how the $750,000 loss of profit claim was compiled or if any document exists which would itemize the elements of loss profit damages totaling $750,000. Solow is unsure whether Castco has any documents that would show how the sum of $500,000 in alleged damages was derived.

White Diamond started to have serious concerns about the open account with Castco in June 2002. The balance then due was well over $500,000 and the amount and frequency of payments had significantly declined. On or about July 16, 2002, White Diamond contacted Castco by e-mail and inquired about payments and a payment plan. Solow replied by e-mail, also on or about July 16, 2002, stating that White Diamond's "concerns" would be addressed "within the next few days." On or about July 30, 2002, Solow e-mailed White Diamond claiming that he would send what was understood to be a payment "schedule" once he returned to the office. Solow had been away from the office as a result of a serious illness of his father.

On or about August 8, 2002, Castco, by e-mail, promised a payment the following week of between $50,000 to $75,000. Additionally, Castco expressed a desire that White Diamond directly receive a duty refund owed to Castco so that Castco could credit White Diamond's account. As promised, Castco did wire White Diamond $50,000 on August 14, 2002, which amount was received into White Diamond's account on August 15, 2002, and was credited accordingly.

In August 2002, a representative of White Diamond, David Russell ("Russell"), traveled from Bangkok to New York for the specific purpose of visiting with Solow and try to make acceptable arrangements for payment of the balance due from Castco. Meetings took place at the Castco offices in Manhattan on August 20 and again on August 21, 2002.

Castco outlined the discussions in a letter, on Castco's letterhead, dated August 21, 2002. Solow typed the letter, signed

**620**

the letter and handed this letter to Russell.

On August 21, 2002, Castco gave diamonds to White Diamond valued at $55,883.95 to hold as an offset to the balance owed White Diamond. Castco also promised, in writing, to continue to make payments to White Diamond out of Castco's cash flow, as possible. Castco promised, in writing, to send White Diamond a tariff refund of approximately $84,000 to the extent that Castco was able.

Castco also acknowledged in writing to White Diamond that any profits realized from direct sales to Castco customers would be off-set against Castco's balance to White Diamond. Additionally, Castco acknowledged that the only claim identified by Castco as unresolved as against White Diamond was a "credit due [Castco] resulting from defectives from shipments that were repaired by Castco in New York, and ultimately shipped to our [Castco's] customers." Castco also conceded in writing to White Diamond that "The [repair] credit does not represent a substantial percentage of your shipments and can be dealt with later." (Letter Castco-/Russell 8/21/02).

At the time that Solow wrote the letter of August 21, 2002, White Diamond had stopped actively manufacturing jewelry for Castco and had not produced an order for Castco since the end of June 2002. On September 11, 2002, Castco sent an e-mail to White Diamond admitting that Castco "has a severe problem" and requesting that White Diamond give Castco "breathing room." (E-mail 9/11/02).

On September 23, 2002, Castco sent another e-mail to White Diamond asking for more time and stating its intention not to leave all of its debts hanging.

On October 18, 2002, Castco sent another e-mail to White Diamond indicating that Castco would be wiring $4,000 "within a few days" and stating that "This is the least I can do and will try to do monthly until this mess is cleaned up." (E-mail 10/18/02). White Diamond did indeed receive $4,000 from Castco on October 24, 2002 and such sum was credited to Castco's account.

On or about October 28, 2002, Castco asked White Diamond by e-mail to produce a small order and over-bill by $3,000 so that Castco "will be reducing the outstanding [balance] by three thousand." (E-mail 10/28/02).

On December 7, 2002, another e-mail was sent by Castco which promised White Diamond "another $4000 this Monday or Tuesday." (E-mail 12/7/2002). White Diamond never received the $4,000 payment promised in the December 7, 2002 e-mail.

During the business relationship between the parties it was the practice for Castco to send White Diamond, either by electronic wire or by check, funds to be applied against the rolling account of Castco's purchases. The payments made by Castco were not applied to any specific or particular invoice or invoices issued by White Diamond.

The first of the several invoices upon which White Diamond relies reflects a balance forward in the sum of over $300,000 as of January 2000. Castco has challenged this amount in this litigation but has not submitted invoices, payments, credits, adjustments or charges to support its contention. Its spreadsheet is challenged as hearsay and without evidentiary value.

According to Castco, at no time during the business relationship between the parties did White Diamond present Castco with an accurate accounting taking into account all the credits, charge-backs, and adjustments. According to White Diamond, Castco received all the invoices and

Solow testified that he maintained a running balance.

According to Castco, White Diamond executed several declarations for repairs certifying that millions of dollars of merchandise was received back from Castco for repair and alterations. According to White Diamond, the amount is less than $200,000.

According to Castco, the repairs of the millions of dollars of merchandise sometimes took weeks for White Diamond to repair and send back to Castco. According to White Diamond, the time for turnaround varied from four days to a little over two weeks.

According to Castco, the statement of account upon which White Diamond relies states that Castco made $3, 785, 983 in payments to White Diamond, when in fact Castco actually paid a total amount to White Diamond in the sum of $5,070,986.91. According to White Diamond, this number is disputed and the spreadsheets on which Castco's assertion is based are hearsay and without evidentiary value.

During the business relationship of the parties, Castco's largest customer was Fabrikant. Whether or not it is one of the largest jewelry companies in the world is disputed.

According to Castco, during the relationship between the parties, White Diamond was fully informed that Castco's customer, Fabrikant, was arranging deals with very large retailers such as Sears, K–Mart, and Walmart, among others, a fact that is disputed by White Diamond.

According to Castco, when White Diamond was offered by Castco to manufacture jewelry for transactions with large retail chains such as Sears and Walmart, White Diamond affirmatively and unequivocally represented to Castco that White

Diamond could meet the standards of Sears and Walmart quality control and would further be able to timely deliver all merchandise to Castco in order to meet Castco's commitments. This assertion is disputed by White Diamond.

According to Castco, the samples manufactured by White Diamond were submitted to Sears and passed the quality control of Sears and were marked as the sample by which all other orders would be judged. This assertion is disputed by White Diamond.

According to Castco, when orders were placed for the Sears program, the merchandise was submitted to Fabrikant and it was clear that White Diamond was using inferior color stones, diamonds, and workmanship, as compared to the master samples. This assertion is disputed by White Diamond.

According to Castco, numerous shipments received by Castco from White Diamond were required to be sent for repairs (and sometimes second and third repairs) which, by reason of seasonal considerations, in effect, rendered the orders placed by Castco for Sears as moot. This assertion is disputed by White Diamond.

According to Castco, the Sears program with Fabrikant was terminated due to the multiple failures of White Diamond. This assertion is disputed by White Diamond.

In a letter from Russell to Solow dated November 22, 2001, Russell stated that in connection with the Sears program, "where we went wrong ... was we never nailed down the specs of the quality that we were to use for both diamonds and stones only the price." White Diamond has challenged the statement as incomplete.

According to Castco, on numerous occasions due to time constraints of orders and firm commitments, rejected merchandise

was required to be repaired by Castco in New York (at U.S. labor prices) instead of being shipped back to White Diamond in Bangkok for repair. According to Castco, White Diamond was fully informed and had consented to this arrangement. White Diamond has challenged this as to the number of occasions, the constraints, and rejection.

According to Castco, in connection with merchandise manufactured by White Diamond for Castco for a Walmart program (through Fabrikant), 7,813 pieces were rejected by Fabrikant because the samples created by White Diamond were far superior in quality than the products delivered by White Diamond. Castco contends that these pieces were required to be repaired in New York overnight by Castco, for which Castco incurred damages. White Diamond has disputed these assertions.

According to Castco, the Walmart program with Fabrikant was terminated due to the multiple failures of White Diamond. White Diamond has disputed this assertion.

According to Castco, in connection with merchandise which was specially manufactured by White Diamond for Castco in connection with a program for Original Designs Inc., several hundred pieces were rejected by the customer due to defective manufacturing of White Diamond. According to Castco, in a letter from Russell to Solow dated November 22, 2001, Russell confirmed the problem and acknowledged that White Diamond's rhodium caused the problem in the manufacturing. White Diamond has disputed this assertion of defective manufacturing and relies upon the entirety of the letters.

According to Castco, after several failures in connection with rejections and untimely orders with several vendors, Fabrikant ultimately refused to do business with Castco. White Diamond has disputed this assertion.

According to Castco, the credits, adjustments, charge-backs, and costs incurred by Castco in connection with the failed Sears, Walmart, and Original Designs Inc. programs are not reflected in the invoices submitted by White Diamond. White Diamond has disputed this assertion. Castco has submitted no credible evidence as to the amount of such credits, adjustments, charge-backs, and costs.

Castco also contends that there are math errors that were never properly adjusted on the invoices issued by White Diamond and submitted in this action to the Court. Castco maintains that it is due a credit of $6,668.23, due to math errors in White Diamond's invoices. According to White Diamond, during the relationship of the parties and at the time of the Solow deposition, Castco did not check the accuracy of the invoices.

According to Castco, there never was any agreement whatsoever, oral or in writing, between White Diamond or Castco, that Castco would pay interest on invoices. White Diamond has disputed this assertion.

According to Castco, the erroneous charges for interest on all the invoices add up to $116,514.33, which Castco contends is due as a credit to Castco. White Diamond has challenged the amount and the assertion.

According to Castco, but for the multiple failures of White Diamond in connection with the Sears and Walmart programs, it is reasonable to assume that Fabrikant would have continued to do business with Castco. White Diamond has disputed this assertion.

According to Castco, after calculating and computing all the adjustments, credits, and costs in connection with all the invoices issued by White Diamond, there is a credit due to Castco from White Diamond

in the sum of $278,225.18. White Diamond has disputed this assertion.

### The Summary Judgment Standard

Pursuant to Rule 56, summary judgment may be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *SCS Communications, Inc. v. Herrick Co., Inc.*, 360 F.3d 329, 338 (2d Cir.2004). The court will not try issues of fact on a motion for summary judgment, but rather, will determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223–24 (2d Cir.1994) (internal citations omitted). If, however, " 'as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.' " *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir.2004) (quoting *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.1996)).

The moving party has the burden of showing that there are no material facts in dispute, and the court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. *Bickhardt v. Ratner*, 871 F.Supp. 613 (S.D.N.Y.1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Thus, "summary judgment may be granted if, upon reviewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993).

A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir.1997).

### An Account Stated Has Been Established

██ Under New York law, an "account stated" refers to a promise by a debtor to pay a stated sum of money which the parties had agreed upon as the amount due. *See e.g., Ally & Gargano, Inc. v. Comprehensive Accounting Corp.*, 615 F.Supp. 426, 428–29 (S.D.N.Y.1985). The promise, which may be either express or implied, must be founded upon previous transactions creating the relationship of debtor and creditor. *Id.; see also Chisholm–Ryder Co., Inc. v. Sommer & Sommer*, 70 A.D.2d 429, 431, 421 N.Y.S.2d 455, 455 (4th Dep't 1979).

██ An objection to an account stated that is first made only after litigation on the account stated has been commenced is, as a matter of law, not made within a reasonable time. *Regent Partners, Inc. v. Parr Dev. Co., Inc.*, 960 F.Supp. 607 (E.D.N.Y.), *aff'd*, 131 F.3d 131, 1997 WL 791546 (2d Cir.1997); *Polygram, S.A. v. 32–03 Enterprises, Inc.*, 697 F.Supp. 132

(E.D.N.Y.1988). The account stated need not necessarily be based on a final statement of account: invoices that are submitted on a regular basis can also create an account stated. *See Hackensack Cars v. Lifestyle Limousine,* 1990 WL 74885, *4, 1990 U.S. Dist. LEXIS 6391, at *11; *In re Ralph Lauren Womenswear, Inc.,* 204 B.R. 363, 375 (Bankr.S.D.N.Y.1997).

■ Both partial payment and assurances of payment after receipt of an account stated are evidence of assent to the account stated. *Itar–Tass Russian New Agency v. Russian Kurier, Inc.,* 1999 WL 58680, **4–7, 1999 U.S. Dist. LEXIS 1101, at *13–*19 (S.D.N.Y. Feb. 4, 1999) (partial payment); *Hackensack Cars v. Lifestyle Limousine,* 1990 WL 74885, *4, 1990 U.S. Dist. LEXIS 6391, at *11 (defendant's testimony that he would pay outstanding notes if he had the money to pay them and did pay four of ten promissory notes, constituted admission of account stated); *Ally & Gargano v. Comprehensive Accounting,* 615 F.Supp. at 429 (where defendant expressed assurances that it would try to pay balance due and made partial payment of balance, it "openly acknowledg[ed] that it owed [plaintiff] the balance due"); *In re Ralph Lauren Womenswear, Inc.,* 204 B.R. at 375 (repeated assurances of payment); *Galbreath–Ruffin Corp. v. 40th and 3rd Corp.,* 19 N.Y.2d 354, 367, 280 N.Y.S.2d 126, 134, 227 N.E.2d 30, 36 (1967) (partial payment); *Morrison Cohen Singer & Weinstein, LLP v. Ackerman,* 280 A.D.2d 355, 720 N.Y.S.2d 486 (1st Dep't 2001) (partial payment coupled with assurances of payment; defendant's general complaint that bills were mounting and she could not afford to pay them was not a sufficient objection to account).

■ Where a plaintiff has set forth a *prima facie* claim for account stated, the defendant must come forward with documentation of any alleged objection made to the account. *See Lankler Siffert & Wohl,*

*L.L.P. v. Rossi,* 287 F.Supp.2d 398, 408 (S.D.N.Y.2003). Unsubstantiated claims of oral objections do not create a material issue of fact, and are insufficient to defeat summary judgment in favor of White Diamond. *Morrison Cohen v. Ackerman,* 280 A.D.2d at 356, 720 N.Y.S.2d at 487 (defendant's conclusory and unsubstantiated allegations that she orally objected to bills was insufficient to defeat summary judgment for plaintiff on account stated).

■ Here, the facts are not in dispute that White Diamond maintained a running account for goods provided to Castco, and regularly submitted invoices to Castco, who then made partial payments on the account. Castco did not question the accuracy of the invoices and did not compare their record of invoices to those listed on the statement of account.

■ Castco did not object to the invoices submitted. Rather, it acknowledged a balance due, made assurances of payment and, indeed, made a number of partial payments, including $55,000 worth of jewelry during the unexpected visit from a representative of White Diamond on August 20–21, 2002.

■ A non-movant may not avoid summary judgment by proffering documents that are not in admissible form. *Maier–Schule GMC, Inc. v. General Motors Corp.,* 154 F.R.D. 47, 58 (W.D.N.Y.1994) (citing *Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.,* 865 F.2d 506 (2d Cir.1989)). Evidence that is not properly authenticated is not in admissible form and therefore may not be considered in support of or in opposition to a summary judgment motion. *See New York ex rel Spitzer v. St. Francis Hosp.,* 94 F.Supp.2d 423, 426 (S.D.N.Y.2000) ("Where a party wishes to have a court consider documents which are not yet part of the court's record, the documents must be attached to and authenticated by an appropriate affidavit and the affiant must be a competent

witness through whom the documents could be received into evidence at trial."); *Crown Heights Jewish Community Council, Inc. v. Fischer,* 63 F.Supp.2d 231, 241 (E.D.N.Y.1999), *aff'd,* 216 F.3d 1071, 2000 WL 794152 (2d Cir.2000) (same).

The Fabrikant documents submitted by Castco in support of its cross-motion do not say where the merchandize originated, nor what was at fault. There are no billing documents or statements between Castco and Fabrikant submitted.

The November 21, 2001 letter that Castco claims constitutes its challenge to White Diamond's account stated does not constitute a timely objection by Castco to White Diamond's account statement because it was written by White Diamond, not by Castco. Russell's admission in that letter that White Diamond had made certain production errors supports that claim, since Russell stated in that letter that "Castco's balance is over $900,000 and climbing," and Castco did not timely object to that statement.

On August 21, 2002, almost a year after the November 21, 2001 letter, Castco brought its relationship with White Diamond up to date not only by admitting a significant debt, but also by making a payment on account and promising future on account payments and minimizing any credit due as "not a substantial percentage of shipments and can be dealt with later."

Where, as here, a plaintiff presents sufficient evidence to demonstrate a *prima facie* claim for an account stated, the defendant's response consists solely of an affidavit by a corporate officer contending that the plaintiff failed to properly credit its account, the defendant's denials in the litigation are considered conclusory and are insufficient to counter the facts established by the plaintiff's documentary evidence. *See Neuman Distributors, Inc. v. Falak Pharmacy Corp.,* 289 A.D.2d 310, 734 N.Y.S.2d 221 (2d Dep't 2001).

Therefore, White Diamond has stated a claim for account stated and is entitled to summary judgment on the basis of invoices submitted to Castco less payments received.

### The Cross–Motion For Summary Judgment Is Denied

█ In its Statement pursuant to Local Rule 56.1(a), Castco has asserted the factual basis for its cross-motion seeking summary judgment on its counterclaims for set-off. These allegations have been denied by White Diamond as set forth above. Because there are material issues of fact, summary judgment is inappropriate. *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 83 (2d Cir.2004).

### Leave To Amend The Answer As To The Counterclaim Is Granted

█ The standard under Rule 15(a), which provides leave to amend "shall be freely given," must be balanced against the requirement under Rule 16(b) that the court's scheduling order "shall not be modified except upon a showing of good cause." Fed.R.Civ.P. 15(a), 16(b). A finding of good cause depends on the diligence of the moving party. *Grochowski v. Phoenix Const.,* 318 F.3d 80, 86 (2d Cir.2003). Furthermore, although Fed.R.Civ.P. 15(a) states that leave to amend a complaint "shall be freely given when justice so requires," it is within the sound discretion of the court whether to grant leave to amend. *John Hancock Mut. Life Ins. Co. v. Amerford Intern. Corp.,* 22 F.3d 458, 462 (2d Cir.1994).

█ Castco did not seek leave to amend until September 2005, after White Diamond moved for summary judgment. Castco in its August 21, 2002 written admissions stated that the "[t]he credit does not represent a substantial percentage of your [White Diamond's] shipments and can

be dealt with later." Notwithstanding, Castco is granted leave to amend its counterclaim.

### Conclusion

The White Diamond motion for summary judgment on its account stated is granted based upon its invoices as reduced by Castco payments. The Castco motion to amend its counterclaim is granted.

Submit judgment on notice granting White Diamond's motion for summary judgment.

It is so ordered.